David W. Gadd (ISB #7605)
STOVER, GADD & ASSOCIATES, PLLC
905 Shoshone Street North
P.O. Box 1428
Twin Falls, Idaho 83303-1428
Telephone (208) 736-9900
Facsimile (208) 736-9929
Email: dwg@ magicvalleylaw.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION

| | |
|---|---|
| GILTNER LOGISTICS, INC., an Idaho corporation,<br><br>     Plaintiff,<br><br> v.<br><br>TRAMAT, LLC, a Texas limited liability company,<br><br>     Defendant. | CASE NO.:<br><br>**VERIFIED COMPLAINT** |

Plaintiff Giltner Logistics Services, Inc. ("Giltner"), by and through its undersigned

counsel, hereby brings its Complaint against Defendant Tramat, LLC ("Tramat"), and in support

thereof, states the following:

**PARTIES**

1.  Giltner is a corporation incorporated under the laws of the State of Idaho and has

its principal place of business in the State of Idaho, located at 834 Falls Avenue, Suite 1220,

Twin Falls, ID 83301.

2.  Tramat is a limited liability company formed under the laws of the State of Texas,

and has its principal place of business in the State of Texas, located at 8131 Lyndon B. Johnson

Fwy Ste 110, Dallas, TX 75251

**VERIFIED COMPLAINT – 1**

3.      Tramat can be served via its designated blanket company agent, #A+ Agents of Process, Inc., whose registered agent in the state of Idaho is Donald G. Hendricksen, 4240 Bott Lane, Meridian, ID 83642.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

5.      Giltner is a corporation incorporated under the laws of the State of Idaho, and has its principal place of business in the State of Idaho. Tramat is a limited liability company formed under the laws of the State of Texas and has its principal place of business in the State of Texas. Therefore, complete diversity of citizenship exists.

6.      The amount in controversy exceeds $75,000.00, exclusive of interests and costs.

7.      This Court has general personal jurisdiction over Giltner. This Court has specific personal jurisdiction over Tramat pursuant to Idaho Code § 5-514 because jurisdiction based on Tramat's contacts with Idaho (including, but not limited to, negotiating and entering into a contract under Idaho law; selecting Idaho as the forum of choice for any dispute related to the contact at issue so that it is reasonably foreseeable that this Court would have personal jurisdiction over it) is not inconsistent with the Constitution of the State of Idaho or the Constitution of the United States.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. Additionally, Giltner is alleging, as an alternative claim against Tramat, a claim under 49 U.S.C. § 14706(d).

9.      Venue is proper in the District of Idaho under 49 U.S.C. § 14706(d) because Tramat operates in the said district.

## FACTS AND BACKGROUND

10.     Giltner is a transportation and logistics company that arranges for the transportation of its customers' cargo.

11.     Tramat is a for-hire motor carrier of property, operating in interstate commerce, and subject to the jurisdiction of and pursuant to a registration issued by the United States Department of Transportation, Federal Motor Carrier Safety Administration under MC-745188.

12.     On or about December 5, 2012, Seyfe Woldemichael, an owner of Tramat, acting for and on behalf of Tramat as Tramat's authorized agent, executed a Broker/Carrier Contract with Giltner, a true and accurate copy of which is attached hereto as **Exhibit A** (the "Contract").

13.     In December 2020, Giltner engaged Tramat to transport a shipment of Italian sausage (the "Freight") from Yoakum, Texas, to East Point, Georgia.

14.     On or about December 14, 2020, possession of the Freight was delivered to and accepted by Tramat.

15.     Due to the perishable nature of the Freight, Tramat was required to maintain the temperature of the Freight at negative ten degrees (-10º) Fahrenheit.

16.     Upon inspection of the Freight in East Point, Georgia, it was learned that temperature of the trailer had been set to zero degrees (0º) Fahrenheit. Additionally, the trailer had been cycling into defrost mode every forty-five (45) minutes, which resulted in the temperature of the Freight being more than forty degrees (40º) Fahrenheit upon arrival at its destination.

17.     As a result of Tramat's failure to maintain the temperature of the Freight at negative ten degrees (-10º) Fahrenheit, the Freight spoiled in transit and was rejected by the buyer.

**VERIFIED COMPLAINT – 3**

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

18.     Giltner realleges and incorporates, by reference herein, the allegations in the previous paragraphs as if fully set forth herein verbatim.

19.     Giltner entered into a valid and enforceable contract with Tramat to arrange for the safe, successful, and complete transportation of the Freight from Texas to the designated location in Georgia.

20.     Giltner has performed all required conditions, covenants, and obligations in accordance with its valid and enforceable contract with Tramat.

21.     Tramat breached the contract by failing to deliver the Freight to its intended destination in good condition, and by failing to compensate Giltner for the loss, in violation of Paragraphs 2.4 and 5.1 of the Contract.

22.     Tramat's breach of contract has caused injury to Giltner, for which Giltner is entitled to recover from Tramat, in an amount to be established at trial, but in excess of $80,070.29, exclusive of interests and costs.

## SECOND CLAIM FOR RELIEF
### (49 U.S.C. § 14706)

23.     Giltner realleges and incorporates, by reference herein, the allegations in the previous paragraphs as if fully set forth herein verbatim.

24.     Giltner's customer, Armada Transportation Solutions ("Armada"), is a "shipper," as that term is used in 49 U.S.C. § 14706.

25.     Tramat is a "carrier," as that term is defined in 49 USC § 13102(3) and used in 49 U.S.C. § 14706.

26.     The Freight was delivered to Tramat in good condition.

27.     The Freight was damaged and had spoiled before delivery to its final destination in East Point, Georgia.

28.     The amount of damages incurred by Armada is $80,070.29.

29.     For good and valuable consideration, Armada has assigned to Giltner its claims against Tramat.

30.     Giltner is entitled to judgment against Tramat pursuant to 49 U.S.C. § 14706.

### REQUEST FOR ATTORNEY'S FEES

31.     Giltner realleges and incorporates, by reference herein, the allegations in the previous paragraphs as if fully set forth herein verbatim.

32.     As a result of the foregoing, Giltner has had to retain the law firm STOVER, GADD & ASSOCIATES, PLLC to pursue its remedies in this action. In accordance with the Idaho Code, including but not limited to, §§ 12-120 and 12-121, and the terms of the Contract, Giltner is entitled to an award of reasonable attorney's fees against Tramat.

**WHEREFORE**, Giltner respectfully requests that the Court:

 A.     Enter judgment in favor of Giltner and against Tramat as to Giltner's claim against Tramat for breach of contract, plus prejudgment and post-judgment interest;

B.     Enter judgment in favor of Giltner and against Tramat as to Giltner's claim against Tramat under 49 U.S.C. § 14706, plus prejudgment and post-judgment interest;

C.     Award Giltner its reasonable attorney's fees, costs, charges and expenses; and

D.     Award Giltner any and all other relief the Court deems just, reasonable, and proper.

**VERIFIED COMPLAINT – 5**

Dated:  April 6, 2022

STOVER, GADD & ASSOCIATES, PLLC


/s/ David W. Gadd
David W. Gadd
Attorneys for Plaintiff




**VERIFICATION**

STATE OF IDAHO   )
                       :ss.
County of Twin Falls

Michelle Baughman, being first duly sworn on oath, deposes and says:

That she is the authorized agent for the Plaintiff in the above-entitled action; that she has read the foregoing Complaint, knows the contents thereof, and believes the facts therein stated to be true to the best of his knowledge, information and belief.


Michelle Baughman


SUBSCRIBED AND SWORN to before me this 8th day of April, 2022.


NOTARY PUBLIC FOR IDAHO
Residing at: Twin Falls, ID
My Commission Expires:  11 | 23 | 2027

DEIRDRE NICOLE WATKINS
NOTARY PUBLIC - STATE OF IDAHO
COMMISSION NUMBER 20215791
MY COMMISSION EXPIRES 11-23-2027

**VERIFIED COMPLAINT – 6**

# EXHIBIT A

# GILTNER LOGISTIC SERVICES INC.

## Broker/Carrier Agreement

This Agreement is made and entered into effective the 5th day of December, 20 12, by and between Giltner Logistic Services Inc. (hereinafter referred to as "Broker") and Tramat, LLC MC# 745188; U.S. DOT # 2141335 ) (hereinafter referred to as "Carrier").

### Background

A.       Broker is an interstate property broker operating pursuant to authority granted to it to do so by the Federal Motor Carrier Safety Administration ("FMCSA") under MC # 388552 that arranges for transportation of freight by motor carrier for Broker's customers;

B.       Carrier is an interstate or intrastate motor carrier operating pursuant to authority granted to it to do so by the FMCSA and the U.S. Dept. of Transportation ("DOT") under the license(s) listed above and/or pursuant to other permits and/or licenses to operate as an intrastate motor carrier granted to Carrier by one or more state regulatory agencies;

C.       Broker and Carrier desire to enter into this Agreement to set forth and memorialize the terms of the Agreement between them so that Broker, operating as a freight broker, may tender one or more loads of freight to Carrier on a continuing basis.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, Broker and Carrier agree as follows:

### Agreement

1.       Scope and Term of Agreement:

1.1       Scope.  Where practical, Broker will provide to Carrier, by electronic or other means, a written confirmation of the verbal rate agreement for each load tendered to Carrier by Broker. Carrier will sign the Load Confirmation for each load tendered and will return the same to Broker as soon as is practical. The terms set forth in this Agreement shall apply, however, to all shipments tendered to Carrier by Broker and accepted by Carrier (whether such acceptance is manifest orally, in writing, or by performance in whole or in part) regardless of whether a Load Confirmation is actually sent to Carrier and regardless of whether the Load Confirmation for a particular load is actually signed by Carrier and returned to Broker.

1.2       Term.  The term of this Agreement shall be one year from the date hereof and it shall automatically be renewed for successive one (1) year periods, unless terminated, upon thirty (30) day's prior written notice, with or without cause, by either Party at any time, including the initial term. In the event of termination of this Agreement for any reason, the Parties shall be obligated to complete performance of any work in progress in accordance with the terms of this Agreement.

1.3       Evidence of Authority and Insurance.  Prior to or upon execution of this Agreement, Carrier will deliver to Broker copies and evidence of Carrier's operating authority from the FMCSA, certificates evidencing the insurance required to be provided and carried by Carrier pursuant to Section 7 hereof, and any other documents or information requested by Broker.

2.       Tender and Acceptance of Freight:

2.1       Tender and Acceptance of Loads.  Broker agrees to offer to Carrier one or more shipments of freight from Broker's customers during the term of this Agreement. Once Carrier agrees, verbally or otherwise, to transport a load, Carrier agrees to provide motor carrier services, including, but not limited to, providing a licensed and qualified driver and all necessary equipment, in order to meet the distinct needs of Broker's customers including the needs of timely delivery. Carrier agrees that it will not supply equipment that has been used to transport hazardous wastes, solid or liquid, regardless of whether they meet the definition contained in 40 C.F.R. § 261.1 et seq. Carrier reserves the right to refuse to transport any shipment prior to picking up or loading such shipment. Once a shipment has been loaded onto Carrier's equipment, however, Carrier agrees to transport such load in a safe and timely manner in accordance with the terms of this Agreement and any Load Confirmation or other documents provided by Broker; and, Carrier agrees that should it return such shipment to its origin or should Carrier fail or be unable to deliver such a shipment to its appointed destination, Carrier shall be liable to Broker for all costs associated with finding and hiring any substitute carrier or employing any other means of delivering such load to its appointed destination and for any other costs associated with transporting such load of freight. Carrier agrees to notify Broker in advance of any accepted or scheduled load that Carrier may not be able to pick up, transport, or deliver in a timely manner.  Such notice must be provided in writing to Broker at least twenty-four (24) hours in advance of the scheduled pick-up for such load.

2.2       Non-Exclusive Agreement.  Broker and Carrier acknowledge and agree that this Agreement does not bind either party to the exclusive services to each other.  Both Broker and Carrier may enter into similar or other agreements with any other person or entity.

2.3       Issuance of Bills of Lading.  Carrier agrees that for each load of freight tendered and accepted hereunder, Carrier will issue and sign a bill of lading in compliance with 49 C.F.R. § 373.101 for each load tendered hereunder and that Carrier will list Carrier's name and MC# on any and all bills of lading, and will list no other name or MC#. If Broker's name is inadvertently or otherwise listed on a bill of lading or other shipping document as the "carrier" or otherwise, such listing shall be deemed to have

Carrier Initial ML

## GILTNER LOGISTIC SERVICES, INC. BROKER / MOTOR CARRIER AGREEMENT

been for convenience only and shall not change Broker's role as an interstate property broker only in relation to any such load of freight; nor shall it change Carrier's role or status as the motor carrier with respect to such load of freight.

2.4     Responsibility/Liability for Freight.   Unless otherwise agreed in writing, Carrier shall become fully responsible for a load of freight and liable for any loss of or damage to such freight when it takes/receives possession of the same, regardless of whether a bill of lading has been issued and/or signed and/or delivered to Carrier.  Such responsibility and liability shall continue until delivery of the freight to the consignee and the consignee's acceptance of the same.  Failure of Carrier to issue and/or adopt a bill of lading, or to sign a bill of lading acknowledging receipt of the freight or otherwise shall not affect the liability of Carrier for damage to and/or loss of such freight.

2.5     Canceled Loads/Trucks Ordered Not Used.  If Broker has tendered a load to Carrier that is subsequently cancelled by Broker or Broker's customer and Carrier has actually sent a driver and equipment to pick-up such a load prior to notification to Carrier that such load has been cancelled, Broker agrees to pay to Carrier and Carrier agrees to accept ninety percent (90%) of any amount that Broker actually collects from its customer relating to cancellation of such load and Carrier shall be entitled to no other amount.  Carrier shall provide to Broker all supporting documentation requested by Broker in order for Broker to present any such claim to its customer in a way that Broker, in its sole discretion, deems appropriate and cost-effective to Broker.

3.     Carrier's Invoice and Payment:

3.1     Payment Terms.  Broker agrees to pay Carrier for Carrier's services rendered hereunder within twenty (25) days of receipt by Broker of Carrier's invoice, completed Form W-9, valid certificates of insurance, copy of carrier's valid authority, and the original proof(s) of delivery and bill(s) of lading for the subject load, so long as there are no exceptions or other claims submitted for loss or damage to the subject freight or relating to any other loads that Carrier is currently or has previously hauled.

3.2     Rates. Carrier and Broker agree that this is an agreement for specified services pursuant to 49 U.S.C. § 14101(b); thus, the terms of any tariff, statute, rule, regulation, or other agreement(s) that are inconsistent with or conflict with the terms of this Agreement shall not apply; and, Carrier expressly waives any and all rights and/or remedies to which it may be entitled under 49 U.S.C., Subtitle IV, Part B (ICC Termination Act of 1995)to the extent that the same conflict with any term of this Agreement. Carrier agrees that the mutually agreed upon rate as set forth in the Load Confirmation is reasonable for delivery of the subject load to its appointed destination, that such rate is inclusive of any license fees, taxes, tolls, permits, costs of loading, stop-offs, unloading or lumpers, escorts, fuel surcharges, accessorial charges, detention and/or demurrage charges (unless otherwise agreed to in writing), that the freight would not have been tendered to Carrier at any higher rate, and that no amount greater than the amount set forth in the applicable Load Confirmation shall be paid to Carrier.

3.3     Billing of Broker Customers.  Carrier agrees that Broker only will and is authorized to invoice Broker's customer; and, Carrier agrees that Broker is the sole and exclusive party that is responsible and/or liable to pay Carrier for its services. Carrier hereby waives any claim it may have, against any person or entity other than against Broker for payment for its services and agrees that Carrier shall not seek payment from any shipper/consignor, consignee, or any other person or entity other than Broker for its services.

4.     Safe Operation, Transportation and Delivery of Load:

4.1     Carrier's Representations and Warranties.  Carrier hereby warrants and represents to Broker that:

a) Carrier  currently has a "Satisfactory" safety rating (or an equivalent thereof under CSA 2010 or other regulations) from the DOT or, alternatively, has received no DOT or other safety rating that is less than a "Satisfactory" rating and, if no DOT safety rating has yet been issued to Carrier, that Carrier operates its business in a way that Carrier believes in good faith would qualify Carrier for a "Satisfactory" DOT safety rating; b) if Carrier receives any DOT or other safety rating during the term of this Agreement that is less than a "Satisfactory" safety rating, or if Carrier's authority to operate as a motor carrier is revoked, suspended, or rendered "inactive" c) Carrier shall at all times operate its business in a safe and prudent manner and in strict and full compliance with all state, federal, and local statutes, rules, and regulations relating to the transportation services to be provided, including, but not limited to, safety of operations, qualification and screening of drivers, hours of service of drivers, maintenance and safe operation of equipment, transportation of Hazardous Materials as defined in 49 C.F.R. § 172.800, § 173 and § 397, et seq. ("HAZMAT"), including the licensing and training of HAZMAT qualified drivers to the extent that any loads of freight tendered hereunder constitute HAZMAT, security regulations, loading and securement of freight, controlled substance and alcohol use testing, sanitation, temperature, and contamination requirements for transporting foods, perishables or other products, all other insurance and workers' compensation requirements, etc.; d) any and all equipment that Carrier will use to transport a load tendered hereunder is safe, has been properly maintained in a manner that it would pass any and all federal, state, or local safety inspections, and that it is properly fit and designed to be used for the particular type of load that is to be hauled; d) Carrier will properly train its drivers in connection with the safe loading, transporting, and unloading of freight tendered hereunder and will abide by all safety rules, regulations, and policies of shippers and consignees to whom freight tendered hereunder is delivered, including, but not limited to, the safety rules, regulations, and policies of job sites to which freight tendered hereunder may be delivered.

5.     Cargo Loss, Damage and Delay Claims.

5.1     Carrier Liability for Loss, Damage, and/or Delay Claims.  Carrier hereby assumes liability for and agrees to pay Broker, Broker's customer, the shipper/consignor, and/or the consignee, for any and all loss, theft, shortage or damage caused to

Carrier Initial _____ ML

# GILTNER LOGISTIC SERVICES, INC. BROKER / MOTOR CARRIER AGREEMENT

any freight tendered to Carrier hereunder while such freight is in transit or is otherwise in Carrier's care, custody, or control; and, Carrier acknowledges and agrees that its liability therefore shall be no less than that of a "common carrier" as provided for in 49 U.S.C. § 14706 (the Carmack Amendment).   In the event that a shipment tendered to Carrier, Carrier's liability therefore shall be in the amount of the original invoice value or, alternatively, the fair retail market value at the destination point, whichever is greater. Carrier shall also be liable to pay the claimant's and Broker's administrative expenses incurred in connection with the filing and prosecution of any claims for loss, theft, shortage, or damage to a shipment or a delay claim, plus the freight charges allocable to the lost or damaged freight. In the event of such a loss, Carrier shall not dispose of damaged freight or freight rejected by a consignee without the prior written consent of Broker and/or the beneficial owner of such freight. Moreover, the shipper/consignor, consignee, or other beneficial owner of the subject freight may determine in its sole discretion whether the entire load or any part thereof should be re-sold as salvage or should be otherwise disposed of or destroyed. Carrier shall not claim or contest that such decision by the shipper/consignor, consignee or other beneficial owner was in breach of any obligation to mitigate damages or is otherwise improper. The shipper/consignor, consignee or other beneficial owner shall, in any event, have the right to remove from the goods shipped any and all identifying marks or labels or, alternatively, to mark the goods "Damaged" or similar notation, whether such goods are sold as salvage or otherwise or are otherwise disposed of or destroyed.   In the event of a claim for delay in delivery of freight ("a delay claim"), Carrier shall pay to Broker, Broker's customer, the shipper/consignor, and/or the consignee, the actual damages caused by such delay claim. The provisions of this Agreement shall supercede and prevail over any terms or provisions to the contrary contained in Carrier's tariff(s), pricing agreements, or other documents.  Any attempts to limit Carriers liability for loss, damage, shortage, or delay claims as set forth in this Agreement shall be ineffective and are hereby deemed and agreed to be null and void.

5.2     Claims Processing.  Carrier agrees that the provisions in 49 C.F.R. § 370.1, et seq.  shall govern the processing of claims and the processing of salvage, except as may be otherwise provided herein.

Claims for damage to a shipment and delay claims shall be filed in writing with Carrier within nine (9) months from the date of delivery.  Claims for loss, theft, or shortage shall be filed in writing with the Carrier within (9) months from the date the goods were scheduled to be delivered.  Any action to recover from Carrier for  such claims will be commenced within two (2) years from the date that Carrier gives written notice that it has disallowed or denies all or any part of a claim. Notwithstanding the terms of 49 C.F.R. § 370.9, Carrier shall either pay, decline or make a settlement offer in writing on all cargo loss and/or damage claims within sixty (60) days of receipt of the claim.  Failure of Carrier to either pay, decline, or make a settlement offer with respect to a claim within sixty (60) day period shall be deemed to be an admission by the Carrier of liability for the full amount of such claim and a material breach of this Agreement. If the shipper/consignor, consignee, Broker customer or other person or entity pursues a claim for cargo loss, theft, shortage, damage or delay involving a shipment tendered to Carrier hereunder directly against Carrier and prevails in pursuing recovery for such a claim, such party shall be entitled to recover from Carrier its costs and attorney fees incurred in pursuing such action. Broker shall have the right to deduct, withhold payment of or otherwise offset against any amounts that Broker may owe to Carrier for the full amount of any claim for loss of and/or damage to cargo, for delay in delivery, or for any other claim that Broker may have against Carrier.  Additionally, should Broker, in its sole discretion, pay any customer, shipper, consignee, or other party in interest for a cargo loss and/or damage claim or claim for delay in delivery of freight, Broker shall be deemed to be subrogated to the rights of such party to pursue such claim against Carrier and any other potentially responsible person or entity.

6.      Accidents:

6.1     Carrier's Reporting of and Indemnification for Accidents.  In the event that Carrier's driver or equipment (or the equipment or driver of any of Carrier's agents, subhaulers, connecting carriers, or other carriers to whom Carrier may tender or broker a load tendered hereunder–hereafter "subcontractor(s)"--despite this Agreement's prohibition against any such delegation of Carrier's duties hereunder) that is transporting a load tendered hereunder is involved in an accident or other incident causing damage to the shipment, involving personal and/or bodily injury or death to another person, involving damage to the property of another person (including, but not limited to, environmental contaminations or other damage to the environment or damage to the facilities of the shipper or the consignee)--all such types of claims being referred to hereafter as "Claims", Carrier shall immediately notify Broker of any such occurrence or accident; and, Carrier shall indemnify, defend, and hold harmless Broker, Broker's customer, and any shipper/consignor and consignee, and any of their respective parent, subsidiary, sibling, or affiliated corporations, companies, or entities, and each of their respective officers, directors, shareholders, principals, employees, and agents from and against any and all such Claims, whether such Claims arise out of or occur during the course of transporting, loading, unloading, staging, or otherwise moving such load, or otherwise while such load is in the possession, care, custody or control of Carrier or its subcontractor(s), or while Carrier or its subcontractor(s) is traveling to or from a pick-up location or a delivery destination, even though the accident or incident giving rise to such Claims may be caused in part by the concurrent and/or contributory negligence or other fault (whether active or passive or of any kind, nature, or description) of a person or entity to be indemnified hereunder; but, not if the accident or other incident is due solely to the negligence or other fault of the person or entity to be indemnified hereunder.  Any person or entity to be indemnified from Claims hereunder shall have the right, but not the obligation, to participate in the defense, negotiation, and/or settlement of any such Claims, either on its own or through attorneys of its own choosing, without relieving Carrier of any of its obligations hereunder.

7.      Insurance:

---

pg. 5                            Carrier Initial _____ ML

## GILTNER LOGISTIC SERVICES, INC. BROKER / MOTOR CARRIER AGREEMENT

7.1   <u>Insurance Required</u>.  Carrier agrees to procure and maintain, at its own expense, at all times during the term of this Agreement, including any extensions thereof, the following insurance coverage in the amounts indicated and in such greater amounts as Broker may specify from time-to-time:

      a)    comprehensive general liability in the amount of, at least, $1,000,000;

      b)    auto-liability (including hired and non-owned vehicles) insurance covering bodily injury (including death) and property damage in the amount of, at least, $1,000,000 ($5,000,000 if transporting HAZMAT), including environmental damages due to release or discharge of HAZMAT, per occurrence;

      c)    cargo damage insurance in the amount of at least $100,000 per occurrence;

      d)    workers' compensation insurance coverage as required by law and employers liability insurance in the amount of at least $100,000.

In addition to the higher coverage limits which may be specified above, the insurance policies shall also comply with minimum requirements of the FMCSA and any other applicable regulatory agency.

7.2   <u>Policies/Cancellation or Expiration of Insurance – Exclusions</u>  CARRIER shall cause BROKER to be listed as a "certificate holder" under all of Carrier's general liability, auto-liability, and cargo damage insurance policies.  This listing shall require the insurance policies to provide a thirty (30) day advance written notice of cancellation or terminations of the above mentioned coverage's.  CARRIER will cause its insurance company to send copies of such certificates of insurance confirming such listing to Broker via facsimile and U.S. mail.  Carrier hereby warrants and represents that its insurance, is valid and continues in effect and that such policies of insurance have no exclusions or waivers that are inconsistent with providing the insurance coverage set forth herein or that would otherwise impair Broker, Broker's customers, shippers/consignors, consignees, or other persons or entities to be indemnified herein or referenced herein from recovering for Carrier's liabilities to such parties hereunder, including, but not limited to, exclusions or waivers relating to: a) water or moisture damage to goods; b) "reefer breakdown" or losses caused by mechanical failures; c) theft, or unattended vehicle; d) exclusions of certain types of cargo; or, d) covering only scheduled vehicles, when the equipment to be used by Carrier to provide the services hereunder are not scheduled vehicles under such policies.  Carrier further warrants and represents that the name under which its motor carrier authority is issued matches exactly the name under the insurance policies required hereunder.  Neither Carrier's failure to procure or maintain the insurance required hereunder or any exclusions or conditions contained in any policies of insurance shall relieve or exonerate Carrier from any of its liability or obligations hereunder, nor shall Carrier be relieved of any liability or obligation hereunder because a claim or obligation exceeds the amount of insurance procured or maintained by Carrier.

8.   <u>Independent Relationship/No Delegation</u>:

8.1   <u>Independent Relationship</u>.  Carrier's relationship to Broker shall at all times be that of an independent contractor and nothing contained herein shall be construed to be inconsistent with that status. No term or provision of this Agreement, nor any act or omission of either party shall be construed for any purpose to express or imply any joint venture, partnership, principal/agent, employer/employee or other relationship between Broker and Carrier. Carrier shall have no authority to act on behalf of Broker or to alter in any manner any contractual or other relationship of Broker with its customers, shippers/consignors, consignees, or any other person or entity. Carrier shall bear all costs of and shall provide all labor, wages, equipment, fuel, insurance, payroll taxes and all other costs associated with performance of Carrier's transportation services. Carrier agrees to indemnify, defend and hold Broker harmless from all claims or liability imposed or asserted against Broker relating to such costs.

8.2   <u>No Control or Right of Control by Broker</u>.  Broker cannot and shall not exercise any control over the manner in which Carrier performs its services hereunder or Carrier's operations, nor does Broker retain any right to control or otherwise supervise Carrier or Carrier's employees or other agents. Carrier shall be solely responsible for any and all management, control, governance, discipline, of its employees, agents, and owner/operators. Even though Broker or its customers, shippers/consignors, consignees, or other persons or entities may from time-to-time in Load Confirmations or other documents provided to Carrier suggest routes, types of equipment, methods of securing loads, methods of loading or unloading freight or other means of transporting and delivering the subject freight, such suggestions, are for informational purposes only.  Carrier retains the right to choose routes, times that Carrier will perform its services, employees, equipment to be used, methods of securing loads, methods of loading or unloading freight and all other means of transporting and delivering the freight. Carrier agrees, however, that it shall deliver each load tendered to it by Broker hereunder to its appointed destination in good condition and in a timely manner according to the dates and times that each such load should be picked-up and delivered and that Carrier will do so in a safe and lawful manner and in accordance with all laws pertaining to hours of service. Carrier should consider instructions, guidelines and/or suggestions from shippers/consignors and/or consignees; Carrier, however, remains ultimately responsible to choose and control the method of loading, unloading, and securing the load and transporting the load and will do so in a safe manner without damaging the load or endangering the public or any person or entity.

8.3   <u>Delegation/Subcontracting/Re-Brokering Prohibited</u>. Carrier shall not re-broker, co-broker, double-broker, subcontract, assign, interline or otherwise transfer or delegate the transportation of any load tendered to it by Broker, nor shall Carrier retain or engage any subhaulers, connecting carriers, rail carriers or other mode of transportation, without the prior written consent of Broker with respect to any and each specific load so delegated.  In the event that Carrier breaches this provision prohibiting re-brokering, subcontracting, interlining or otherwise delegating any of Carrier's duties hereunder, Carrier agrees to indemnify, defend, and hold harmless Broker, Broker's customers, the shipper/consignor, the consignee, and any other "bill to" party for any claims or actions arising out of or relating to the acts or omissions of the person or entity to whom Carrier re-brokered, assigned, interlined, transferred the load or otherwise delegated its duties with respect to such load, whether such claims

## GILTNER LOGISTIC SERVICES, INC. BROKER / MOTOR CARRIER AGREEMENT

or actions involve damage to freight or other property or involve personal injury, including death. In addition, Broker retains the right, at Broker's sole option, to not pay Carrier for transporting such a load and to charge Carrier the total amount that would have been paid to Carrier for transporting such a re-brokered or delegated load.

9.    Non-Soliciting/Confidentiality:

9.1    Covenant to Not Solicit. Carrier recognizes that Broker is providing a valuable service under this Agreement in arranging for the transportation of freight and tendering of freight to Carrier to be hauled. Therefore, as part of the consideration for this Agreement, Carrier agrees not to solicit or to otherwise perform transportation or broker services, either directly or indirectly, for any customer of Broker during the term of this Agreement (including any extensions hereof) and for a period of twenty-four (24) months following termination of this Agreement, except as is required by Carrier to fulfill its obligations under this Agreement. Should Carrier violate the non-solicitation provisions of this Section 9, Carrier agrees to pay Broker, as liquidated damages, an amount equal to fifteen percent (15%) of the gross transportation revenue generated by Carrier's performing transportation or brokerage services for any Broker customer for a period of twenty-four (24) months.

9.2    Confidential Information. Carrier further agrees that it shall protect and keep confidential any and all non-public, confidential, or proprietary information of Broker, including, but not limited to, the identity of customers, freight and brokerage rates, and/or any information disclosed or provided to Carrier pursuant to 49 C.F.R. § 371.3, that might be provided to Carrier in connection with performing this Agreement.

10.    Additional Remedies/Injunctive Relief. All provisions of this Agreement may be specifically enforced, however, the failure of Broker to promptly enforce such provisions shall not be construed to be a waiver of Broker's rights hereunder. In addition, Carrier recognizes that the payment of damages hereunder may not fully compensate Broker for Carrier's breach of the provisions of this Agreement and that Broker will likely suffer irreparable harm from such a breach. Accordingly, Carrier agrees that should it breach or violate the provisions of this Agreement, that Broker will be entitled to injunctive relief prohibiting Carrier's breach or violation.

11.    Governing Law/Jurisdiction/Attorney Fees: This Agreement shall be deemed to have been negotiated and entered into within the State of Idaho. Accordingly, except to the extent (if any) preempted by federal law, the laws of the State of Idaho shall govern the interpretation of this Agreement. Carrier expressly submits to the jurisdiction of the Courts of the State of Idaho and the United States District Court for the district(s) located within Idaho and agrees that jurisdiction and venue shall be proper in such Courts and Carrier waives any claim or defense that such Courts will be an inconvenient forum. Carrier agrees to pay to Broker any and all costs and attorney fees incurred by Broker in enforcing any term or provision of this Agreement, whether incurred before or after institution of a formal legal proceeding and whether incurred before or after entry of a judgment.

12.    Miscellaneous: This Agreement and any Load Confirmations or other documents issued or accepted by Broker pertaining to a load for freight tendered by Broker to Carrier constitute the entire agreement between the parties hereto and are intended to be a complete integration of terms. No other prior or contemporaneous agreements exist between Broker and Carrier, except as are set forth herein. No termination or expiration of this Agreement shall relieve either party from any obligation that was incurred hereunder prior to the effective date of such termination or expiration; and, this Agreement shall inure to the benefit of the parties hereto and their respective heirs, successors or assigns. The person executing this Agreement on behalf of Carrier warrants and represents that he/she has valid, existing actual authority to execute the same on behalf of Carrier and agrees to personally indemnify Broker from any breach of this warranty of authority. If any term or provision hereof is held invalid or unenforceable by a court or tribunal of competent jurisdiction, such term or provision shall be deemed to be modified to be enforceable or, alternatively, shall be deemed to be severed here from, and shall not affect the remaining provisions hereof, which shall remain enforceable to the full extent allowed by law. The failure of either party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach. Any paragraph and/or section headings contained herein are for convenience only and shall not affect the interpretation or construction of this Agreement. This Agreement may be executed in any number of counterparts, each of which will be deemed to be a duplicate original hereof.

Giltner Logistic Services, Inc. ("Broker"):          Carrier: Tramat, LLC

By: _____ CFO                    By: _____
    for Giltner Logistic Services, Inc.

                                             Title: Owner

**Carrier must SIGN AND FAX this Agreement and send it along with a completed W-9, copy of carrier authority, and insurance certificate(s) to: 208-914-7170. Or email to carriers@giltner.com**

pg. 7                         Carrier Initial _____ SW